Christopher P. BORST, Respondent,

v.

STATE of Missouri, Appellant.

No. WD 71321.

Missouri Court of Appeals,
Western District.

Feb. 22, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 29, 2011.

Application for Transfer Denied
May 31, 2011.

Shaun J. Mackelprang, and Terrence M. Messonnier, Jefferson City, MO, for appellant.

John P. O'Connor and Michael L. Belancio, Kansas City, MO, for respondent.

Before Division Four: LISA WHITE HARDWICK, C.J., Presiding, GARY D. WITT, J. and KEITH MARQUART, Sp.J.

LISA WHITE HARDWICK, Chief Judge.

The State of Missouri appeals the circuit court's judgment granting Rule 29.15 post-conviction relief to Christopher Borst based on a finding of ineffective assistance of counsel. The court set aside Borst's convictions on two counts of first-degree statutory sodomy and two counts of incest and ordered a new trial on those charges. On appeal, the State contends the circuit court clearly erred in granting such relief because the evidence did not establish that Borst's trial counsel was ineffective in failing to present the victim's school and medical records and in failing to cross examine the victim's mother about prior false accusations. For reasons explained herein, we reverse the circuit court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

Christopher Borst and Shelby Whitehouse ("Shelby") were married in April 1997. Their daughter, K.B., was born on October 7, 1998. Borst and Shelby separated in July 1999. Shelby moved into the home of her friend Michelle Miller ("Michelle")[1] and began a relationship with Michael Magnuson, an old college acquaintance. Borst had joint legal custody of K.B. with Shelby and enjoyed liberal visitation, providing sole care for K.B. on Fridays and every other weekend. Shelby moved out of Miller's home in February 2000 and moved in with her parents. The divorce was finalized in March 2001, and

---

1. At the time of the post-conviction evidentiary hearing, Shelby Whitehouse had become Shelby Magnuson, and Michelle Miller had become Michelle Hanks. For ease of reference throughout, we refer to Shelby Magnuson as "Shelby" and Michelle Hanks as "Miller." No disrespect is intended.

Shelby and K.B. moved in with Magnuson six months later.

On March 1 and 2, 2002, K.B. spent the night in Borst's apartment. On March 3, Shelby observed K.B. playing with Barbie dolls in a sexually suggestive manner. When questioned, K.B. stated she had learned what she was doing from seeing "movies with naked people" at Borst's apartment. K.B. told Shelby she sat on Borst's lap and stuff came out of his "pee-pee." K.B. said Borst touched her "po-po" and "it's to make you feel good."

Later when Shelby was sitting on her bed and talking on the phone, K.B. lay on the bed and put her legs around Shelby's back and pelvis and "started humping." When Shelby asked K.B. what she was doing, K.B. told her, "Just sit there and do what dad does."

Shelby took K.B. to Children's Mercy Hospital for an evaluation. Mary Hegenbarth, an emergency pediatrician,[2] performed a sexual assault forensic examination (SAFE) on K.B. The examination revealed vaginal irritation, discharge, and a small tear in K.B.'s perineum (area between genitals and anus). Because these types of conditions can be caused by hygiene factors, genital abnormality, or sexual abuse, Hegenbarth could not determine to a reasonable degree of medical certainty whether K.B. had been sexually abused.

On March 4, 2002, Jill Hazel of the Division of Family Services ("DFS") separately interviewed Shelby and K.B. at Shelby's residence. K.B. told Hazel that "she sucked on her daddy's pee-pee and white stuff came out" and "they wiped it up real quick." K.B. told Hazel she and her father had "watched movies with adults that had no clothes on." Hazel arranged for an additional interview with K.B. at the Child Protection Center.

On March 7, 2002, Julie Donelon of the Child Protection Center conducted a recorded interview with K.B. K.B. identified various parts of the human anatomy using male and female dolls. She identified the vaginal area as "po-po," and the penis as "pee-pee" or "potty." K.B. indicated that Borst had touched her "po-po" and bottom with his finger. She stated she had once watched a movie in Borst's apartment where she saw a bottom, a "po-po," and naked people. K.B. initially denied ever touching Borst, stating she didn't want to talk about it, but later stated she had seen Borst's "potty." She stated she had sucked on Borst's "potty" and white stuff, which felt like juice, came out and went on a washcloth. K.B. said Borst had touched inside her "po-po" and put his "potty" inside of her "po-po" to make her feel good.

On March 8, 2002, Borst voluntarily met with Tom Bajt, a DFS investigator, for an interview. Hazel was also present during the interview. Borst told the DFS officials that he had masturbated in the living room of his apartment while K.B. was present. When he finished masturbating, K.B. placed her hands and mouth on his penis and he had not stopped her. He ejaculated and then cleaned up with toilet paper or a washcloth. Borst admitted that what K.B. had said was true, and he asked for "help" in the form of "counseling or some therapeutic recommendations." Borst said he hoped K.B. would not have to testify and would be safe from further harm. Borst said he understood Shelby wanted to move to Joplin, and he had no problems with the move.

2. The record indicates that Magnuson also worked as a pediatrician at Children's Mercy Hospital. Hegenbarth was his superior.

On March 11, 2002, K.B. was visiting the home of Melinda Houdyshell for a play date with Houdyshell's five-year old daughter. Houdyshell walked into a room where the girls were playing and discovered both girls naked from the waist down. Houdyshell's daughter was on top of K.B. When Houdyshell questioned the girls, K.B. said she was showing Houdyshell's daughter what Borst had taught her.

On March 22, 2002, Borst called Detective Janna Eikel, a Kansas City police officer who was investigating the allegations of sexual abuse. Borst was concerned about not being able to visit K.B. Eikel told Borst that he should not be speaking with K.B. Borst told Eikel he "was thinking he was a sexual offender, so that he had made an appointment with a doctor for a forensic assessment." Borst said he was "out of it" when the incident happened and did not intend for it to happen, but he "just flipped out." Borst said he was upset about having to move out of his apartment and was "in never-never land that day." He acknowledged that if he did what he was accused of doing, then he deserved punishment. Borst said he was "beginning to believe that he was a sick and dangerous person."

The State charged Borst with one count of first-degree statutory rape, Section 566.032, three counts of first-degree statutory sodomy, Section 566.062, four counts of incest, Section 568.020, and one count of furnishing pornographic material to minors, Section 573.040.[3] At the jury trial held in August 2004, Borst was represented by his defense co-counsel, Richard Carney and Marilyn Keller.

During trial, K.B. testified that Borst had touched her "po-po" and she had touched his penis with her finger. K.B.'s previous statements about sexual abuse were admitted into evidence through the testimony of Shelby, Hazel, Donelon, and Houdyshell, pursuant to Section 491.075. The State also presented testimony from Hegenbarth, Bajt, and Eikel as related above.

During cross-examination, defense counsel asked Shelby if she had ever made a complaint to DFS about anyone else besides Borst. The State objected and, outside the hearing of the jury, explained that Shelby had once threatened to make a false report of child abuse against Miller to DFS.[4] The State argued that questioning about a *threat* of a complaint to DFS about someone other than Borst was irrelevant and highly prejudicial. Defense counsel responded that Borst was entitled to show that Shelby was aware that a report to DFS would end contact between the alleged victim and the accused.

The trial court ruled that the specific allegations of threats to make false reports to DFS were not relevant. However, the court allowed defense counsel to ask whether Shelby knew what happened when an allegation of sexual abuse was made to DFS. The trial court also stated that defense counsel could later make a record regarding the matter outside the hearing of the jury. Defense counsel then cross-examined Shelby as follows:

> [Defense counsel:] [Shelby], you are aware, are you not, that once you make a sexual abuse allegation to DFS, that in all probability contact with the alleged

---

3. All statutory citations are to the Revised Statutes of Missouri 2000, as updated by the Cumulative Supplement 2010, unless otherwise indicated.

4. During a pre-trial Section 491.075 hearing, Shelby testified that in March or April of 2000 she had threatened Miller with making a false complaint against her to DFS but never actually made a report to DFS.

perpetrator and the child will be severed; is that correct?

[Shelby:] My understanding is, is once you make an allegation to DFS, they investigate it, and if they find probable cause or find after they do the interview, if they find that the information is correct or reliable, whatever their terms are, that, yes, visitation or whatever would be stopped.

[Defense counsel:] And you knew that at the time you made the allegation in this case, didn't you?

[Shelby:] Yes.

When given the later opportunity to make a record outside the hearing of the jury, defense counsel explained to the trial court:

We have developed a theory of defense, and the Court is well aware of the fact, because we've had several discussions, that [Shelby] manipulated her daughter, and the motive for doing that was to get the kid away from the father because he's a problem for her move to Joplin.

. . . .

Approximately a year, year and a half before this, I want to say there was a fight between [Shelby and Miller] who grew up as best friends. And this is what the evidence would show. And that when [Miller] discovered that [Shelby] had been lying to her about certain things, including some things involving [Borst], there was a confrontation.

Not only did [Shelby] say, I'm going to DFS and make allegations that you abused your son, but you abused my daughter.... And then ... I believe it was May of 2001. May of 2000—what she gets is a call with threats that I have reported you to DFS, you've abused your son and you've abused [K.B.]. And that's two threats.

And when you couple that with a threat with what happened with [Borst] a year and a half or so later, then you're getting a pattern that shows that DFS figures into her play when someone is either an obstacle or presents a problem to her.

. . . .

And this ties in to immediately her going and saying, Here's an abuse allegation against my daughter. It really goes to the core of our theory and our defense, and we, obviously as the Court knows, we feel strongly about it.

. . . .

And these are not specific instances of uncharged conduct.

One of the ways to impeach a witness is to show what they do, that they have an opportunity to lie, a motive to lie, and when they get that and they exercise it, we're not charging her with an uncharged conduct. We're saying this is— we're impeaching her.

After this explanation, the trial court reaffirmed its ruling that defense counsel were not permitted to question Shelby specifically about her threatened accusations against with Miller because those accusations were not relevant to the charges against Borst.

During cross-examination, Shelby also testified there was only one instance where K.B. had suffered from diaper rash, which required the application of ointment when she was less than six months old. She stated that she couldn't recall K.B. "having a problem with diaper rash."

Borst testified in his own defense at trial. He said there was an occasion when he got out of the shower and caught K.B. watching one of his pornographic videotapes. He immediately took the video out of the VCR and threw the tape into the trash. Borst denied masturbating in front

of K.B. or engaging in any sexual activity with her. He denied telling Eikel that he had engaged in sexual acts with K.B. but admitted saying that he had caught K.B. watching the pornographic videotape and that he "should be punished for that."

Before defense counsel called Miller to the stand, the State brought the subject of Miller's expected testimony to the trial court's attention. Defense counsel explained during a sidebar conference that Miller would testify that Shelby had said her previous allegations of physical abuse by Borst were untrue. Defense counsel stressed that Miller would not testify about Shelby's threats to make false allegations against Miller to DFS (because such testimony already been excluded by the trial court) but rather about Shelby's false allegations of physical abuse against Borst. The State argued that such extrinsic impeachment testimony was improper because Shelby was never asked, on cross-examination, whether she had made false allegations of physical abuse against Borst. The trial court ruled that Miller's testimony would not be permitted because it was "pretty far afield" and not relevant to the issues of the case.

The jury found Borst guilty of Counts II and IV for first-degree statutory sodomy and Counts VI and VII for incest. The jury acquitted him on the remaining four counts. The court sentenced Borst to prison terms of twelve years for each count of statutory sodomy and two years for each count of incest. The court ordered the sentences for statutory sodomy to run concurrent to each other but consecutive to the two counts of incest, which run concurrent to each other, for a total of fourteen years of imprisonment.

On direct appeal, Borst argued that the circuit court erred in excluding the evidence of Shelby's false accusations of physical abuse against him and her threats to make false allegations of abuse to DFS against Miller. This court rejected those arguments and affirmed Borst's convictions by summary order pursuant to Rule 30.25(b). *State v. Borst*, 202 S.W.3d 629 (Mo.App.2006).

On October 12, 2007, Borst timely filed a Rule 29.15 post-conviction motion that was later amended by appointed counsel. The amended motion alleged fourteen "grounds" of ineffective assistance of trial counsel.

Following an evidentiary hearing, the motion court found that Borst was entitled to relief on two grounds. With regard to Ground 2, the court determined that trial counsel, Carney and Keller, were ineffective in failing to cross-examine Shelby about allegedly false accusations of abuse against Borst and Miller. With regard to Ground 14, the court ruled that trial counsel were ineffective in failing to present medical records, school records, and witnesses to impeach Shelby's denial that K.B. did not have diaper rashes and other medical problems relative to vaginal irritation. Based on these conclusions, the court entered a judgment vacating Borst's convictions and ordered a new trial on the two counts of sodomy and two counts of incest. The State appeals the judgment granting post-conviction relief.

## STANDARD OF REVIEW

We review the motion court's disposition of a Rule 29.15 motion for clear error. Rule 29.15(k). "Findings and conclusions are clearly erroneous only if a full review of the record definitely and firmly reveals that a mistake was made." *Morrow v. State*, 21 S.W.3d 819, 822 (Mo. banc 2000).

To be entitled to post-conviction relief for an ineffective assistance of counsel claim, the movant must show that: (1) his trial counsel failed to exercise the level of

skill and diligence that a reasonably competent counsel would exercise in a similar situation; and (2) counsel's failure prejudiced the defense. *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009) (*citing Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Both the performance and prejudice prongs must be proved by a preponderance of the evidence. *Id.*

■■■■ To satisfy the performance prong, the movant must overcome a strong presumption that counsel's conduct was reasonable and effective trial strategy. *Id.* at 176. The evidence must establish " 'specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance.' " *Id.* (*quoting Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006)). Movant cannot rely on the " 'distorting effects of hindsight,' " and we must deferentially review the situation from the attorney's perspective at the time of representation. *Moton v. State*, 716 S.W.2d 345, 347 (Mo.App.1986) (*quoting Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

■■■■ To satisfy the prejudice prong, the movant must demonstrate, absent the claimed errors, there is a reasonable probability that the outcome would have been different. *Zink*, 278 S.W.3d at 176. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Anderson*, 196 S.W.3d at 34–35 (*quoting Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). "The relative strength or weakness of the prosecution's case is significant in determining whether any deficiencies in trial counsel's performance were prejudicial. . . ." *Clay v. State*, 954 S.W.2d 344, 346–47 (Mo.App.1997). "Each case must be decided on its own facts." *Deck v. State*, 68 S.W.3d 418, 431 (Mo. banc 2002).

## ANALYSIS

### 1. Failure to Present Evidence of K.B.'s Medical History

■■ In Point I, the State contends the motion court clearly erred in granting relief on Borst's claim that his trial counsel were ineffective in failing to present medical and school records regarding K.B.'s diaper rash. The State argues there was no evidence to indicate the existence or contents of such records, and there was no evidence to indicate that trial counsel made an unreasonable decision to forego using such records. The State also points out that the motion court's judgment did not make any specific findings or conclusions with regard to this claim of ineffective assistance, as required by Rule 29.15(j).[5]

Ground 14 of Borst's Rule 29.15 motion asserted "[t]rial counsel was ineffective in failing to obtain and use medical and preschool/day care records, and to call other witnesses to corroborate [Borst's] testimony concerning the minor's diaper rashes and frequent constipation, which would also impeach [Shelby] as to her denial that

---

5. The State concedes that it waived any right to challenge this deficiency in the "form or language of the judgment" because it did not file a motion to amend the judgment. Rule 78.07(c). Borst argues that the State also waived any right to challenge the sufficiency of the evidence to support the relief granted on this claim. We disagree. The State's failure to file a post-judgment motion does not preclude it from challenging, on appeal, the sufficiency of the evidence to support the relief granted on the ineffective assistance claim. *See 8000 Md., LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 446 (Mo.App. 2009) (Challenges to the admissibility of evidence, sufficiency of evidence, or propriety of damages recovered "are not the types of errors that must be raised in a motion to amend the judgment in order to preserve these issues for appeal.").

her child had said problems." The motion alleged such evidence "could have had an impact on the jury and resulted in a different outcome, especially as to the credibility between [Borst] and [Shelby.]" The motion recited that Borst would present K.B.'s medical and school records, as well as testimony from his trial co-counsel and from witnesses Andrea Jack, Suzanne Montegue, Deborah Hartmer, Michelle Miller, and Anjali Dooley, to support this claim of ineffective assistance.

At the post-conviction hearing, Miller testified that she "babysat" K.B. for a period of time and recalled the child having diaper rashes and extreme constipation. Miller's last contact with Shelby and K.B. occurred more than two years prior to the allegations of sexual abuse against Borst.

Borst also presented testimony from his trial co-counsel, Keller and Carney, at the post-conviction hearing. Both counsel testified that they saw no need to present K.B.'s medical or school records in light of other evidence adduced at trial. Keller noted that the records would not have contradicted any of the findings from the SAFE report. Carney explained that he "didn't believe it was necessary" to introduce any such records because Borst was expected to testify about K.B.'s diaper rash and constipation.

The testimony from Miller, Keller, and Carney is the only evidence Borst presented with regard to his claim in Ground 14. Contrary to the recitation in his motion,

Borst did not present any of K.B.'s medical or school records nor any testimony from the remaining four witnesses listed.

Based on this record, we find no evidence that trial counsel was ineffective in failing to present records or witnesses regarding K.B.'s medical condition. The calling of witnesses and presentation of evidence are generally matters of trial strategy. *Dishmon v. State*, 248 S.W.3d 656, 663 (Mo.App.2008). Trial strategy decisions may serve as a basis for ineffective assistance of counsel only if they are unreasonable. *Zink*, 278 S.W.3d at 176.

Borst failed to overcome the strong presumption that his counsel's strategic decision was reasonable and effective. Both trial counsel explained that they considered presenting additional evidence of the child's diaper rash and constipation but determined it was unnecessary in light of other evidence at trial.[6] Mary Hegenbarth, the pediatrician who examined K.B., testified at trial that the child had vaginal irritation, discharge, and a perineum tear, but the evidence was inconclusive as to whether those conditions resulted from sexual abuse. Hegenbarth explained that all of the conditions are common in young children and can be caused by poor hygiene, diaper rash, constipation, genital abnormality, or sexual abuse. Hegenbarth said that K.B. had a history of constipation, as reported to her by the child's mother, Shelby. Hegenbarth also noted that the perineum tear was not "fresh" and did not likely result from "acute injury"

6. Although the motion court did not make specific findings on the claim that counsel was ineffective in failing to present evidence of K.B.'s medical history, the judgment does include findings about the relative credibility of trial co-counsel Keller and Carney in testifying at the post-conviction hearing. The motion court found that Carney was antagonistic toward his former client, Borst, and that Carney's testimony "often times conflicted with that of [h]is co-counsel," and with the transcripts. The motion court concluded that Keller's testimony was more credible than Carney's. This credibility finding has no bearing on the sufficiency of the evidence on Ground 14, because there was no conflict in the testimony of Carney and Keller as to whether further evidence of K.B.'s medical history was necessary.

because the child's mother reported having seen it previously.

Hegenbarth's testimony significantly benefited Borst's defense because it provided alternative explanations for the conditions noted during the SAFE examination and did not confirm the allegations of sexual abuse. In contrast, Shelby's testimony did little to blunt or refute the pediatrician's report. Shelby merely testified that K.B. did not have a problem with diaper rash, other than one instance for which she was treated with ointment as an infant. Shelby did not dispute telling Hegenbarth that K.B. suffered from constipation and had previously shown signs of a perineum tear.

Trial counsel had no compelling need to impeach Shelby because her statements regarding the diaper rash did not contradict the most valuable aspects of Hegenbarth's report from a defense perspective. If there was any need to refute Shelby's brief statement, trial counsel knew that Borst could testify that K.B. had consistent problems with diaper rash. However, viewed in the full context of Hegenbarth's report and testimony, trial counsel made a reasonable decision not to present further evidence on the issue of diaper rash. Trial counsel also reasonably determined there was no need for additional evidence on the child's history of constipation because Hegenbarth's testimony on that issue was uncontroverted.

All of the evidence presented at the post-conviction evidentiary hearing unequivocally indicates trial counsel's decision not to introduce evidence relating K.B.'s diaper rash and constipation was reasonable trial strategy. As noted, Borst never presented the medical records, school records, and testimony from other witnesses, which he claims would have supported his allegations in Ground 14. He only offered testimony from Miller that reinforced Hegenbarth's statements about the child's history of constipation and made references to a diaper rash condition that occurred more than two years before the allegations of abuse. Even if Miller's remote testimony had been used to impeach Shelby, there is no reasonable probability that it would have affected the jury's verdict because the State relied on far more than Shelby's allegations in presenting a strong case against Borst.

The jury heard live testimony from K.B. and several witnesses to whom she made detailed statements about the acts of sexual abuse. K.B. testified that her father touched her "po-po" and that she touched his penis with her finger. Two DFS officials, Tom Bajt and Jill Hazel, testified that Borst admitted K.B.'s allegations were true and acknowledged that he needed counseling. Borst specifically told the DFS officials that he masturbated in K.B.'s presence and allowed K.B. to place her hands and mouth on his penis. Borst explained to Detective Jana Eikel that he was "out of it" when the incident happened with K.B. and he "just flipped out." Borst also told Eikel that he had made an appointment with a doctor for treatment as a sexual offender. The jury did not have to rely on Shelby's testimony regarding the allegations of abuse because there was substantial evidence from the victim, other witnesses, and Borst's own admissions to support the verdict finding him guilty.

Borst failed to meet his burden of proving that his trial counsel provided ineffective assistance and that he was thereby prejudiced. Accordingly, the motion court clearly erred in granting post-conviction relief on Ground 14. Point I is granted.

### 2. Failure to Cross–Examine Shelby Regarding Prior False Accusations

In Point II, the State contends the motion court clearly erred in granting relief

on Borst's claim that his trial counsel was ineffective in failing to cross-examine Shelby regarding her previous false accusations of physical abuse against Borst and her threats to make false accusations of abuse to DFS against Miller. Ground 2 of Borst's Rule 29.15 motion for post-conviction relief alleged that such cross-examination would have laid the foundation for Miller to impeach Shelby on these accusations and damage her credibility. We address the accusations separately.

### A. Shelby's Accusations of Physical Abuse Against Borst

■ We first address the motion court's determination that trial counsel was ineffective in failing to cross-examine Shelby about her prior accusations of physical abuse against Borst. The State contends this ruling was clearly erroneous because the evidence established that trial counsel made a reasonable strategic decision to avoid further testimony from Shelby that would have harmed Borst's defense.

■ "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson,* 196 S.W.3d at 33. " '[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable[.]' " *Id.* (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). " 'Where counsel has investigated possible strategies, courts should rarely second-guess

counsel's actual choices.' " *Id.* (quoting *Middleton v. State,* 103 S.W.3d 726, 736 (Mo. banc 2003)). "It is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy." *Id.*

At the post-conviction hearing, trial co-counsel Carney and Keller testified that they made a specific decision to forgo questioning Shelby about her prior accusations of physical abuse against Borst. Even after Borst mentioned the accusations of physical abuse during his direct examination, against the advice of counsel, and had been cross-examined on the matter, Carney and Keller made the explicit decision to avoid any further testimony from Shelby about the allegations of physical abuse. Both counsel believed additional testimony on this issue would only hurt Borst's defense on the charges of sexual abuse.[7] Counsel also feared that Shelby, if recalled to the stand, would testify that Borst had, in fact, physically abused her.

The motion court concluded that trial counsel should have questioned Shelby about the prior accusation of abuse against Borst in order to lay the foundation for impeachment testimony by Miller, who would have said that Shelby told her the accusation was false. The motion court found trial counsel had "no credible strategy for not doing so" because there was other testimony in the record about the allegations of physical abuse against Borst. However, trial counsel explained that there was little chance of impeaching Shelby's

---

**7.** Co-counsel Keller testified at the post-conviction hearing:

[I]t was our opinion that that would not be helpful to bring in that type of allegation and set that before the jury because then we would be trying to defend against a physical abuser type of allegation as well.

We had sort of separated out the claims of abuse thinking, okay, well—just to kind of make it clear, I think Shelby had made

an allegation of physical abuse against [Borst], and it resulted in a restraining order against [Borst].

But we felt like that wouldn't be helpful to our trial theory, to try and bring that in because I didn't know that we could effectively defend that because ultimately what happened was he consented to the restraining order being placed.

accusation because Borst had consented to a restraining order at the time the physical abuse was reported. Co-counsel Keller testified at the post-conviction hearing: "If we were to bring in an allegation that Shelby had made some false allegation of physical abuse and then have it play out that there was in fact a restraining order entered against [Borst], we didn't think that that advanced for us to establish that she was a liar."

Trial counsel made a practical determination that cross-examining Shelby regarding her accusations of physical abuse would have weakened Borst's defense against the charges of sexual abuse and would not have laid the foundation for effective impeachment of Shelby's credibility. This well-reasoned trial strategy, even if not resulting in an acquittal on all charges, cannot serve as the basis for the claim of ineffectiveness. The motion court clearly erred in second-guessing co-counsel's reasonable decision to pursue this course of action even though other strategies might have been available.

 We also conclude, as discussed previously, that Borst was not prejudiced by co-counsel's decision not to pursue further impeachment of Shelby. Generally, the mere failure to impeach a witness does not entitle a movant to post-conviction relief. *State v. Phillips,* 940 S.W.2d 512, 524 (Mo. banc 1997). "When the testimony of the witness would only impeach the state's witnesses, relief on a claim of ineffective assistance of counsel is not warranted." *McClendon v. State,* 247 S.W.3d 549, 556–57 (Mo.App.2007). "Where . . . the issue is impeachment, movant must show that had the witness been impeached, it would have provided a viable defense or otherwise met the *Strickland* standard." *Black v. State,* 151 S.W.3d 49, 55 (Mo. banc 2004). Defense counsel provides ineffective assistance when unoffered and admis-

sible evidence goes "to a central, controverted issue on which the jury focused during deliberations," which "[i]f believed by the jury, there is a reasonable probability that the outcome of the trial would have been different." *Id.* at 58.

Although Shelby's credibility was a major focus of Borst's defense, the State presented substantial evidence to support the convictions without consideration of Shelby's testimony. The jury heard testimony from multiple witnesses about K.B.'s detailed descriptions of sexual abuse and Borst's admissions to the allegations of misconduct. Given the weight of the evidence supporting the guilty verdict, we find it unlikely that additional impeachment of Shelby would have yielded a different outcome.

Borst failed to prove both the performance and prejudice elements of his claim that trial counsel unreasonably failed to cross-examine Shelby on her previous accusation of physical abuse. Accordingly, the motion court clearly erred in granting relief on this post-conviction claim.

### B. Shelby's Threats to Make False Allegations to DFS Against Miller

 We next address the motion court's determination that trial counsel was ineffective in failing to cross-examine Shelby about her threats to make accusations of abuse against Miller to DFS. The motion court found that such cross-examination would have laid the foundation for Miller to impeach Shelby by testifying that the accusations were false. The motion court further found that trial counsel wanted to use this information for impeachment purposes "but could not figure out how to properly get the same before the jury." Thus, the motion court concluded that "trial counsel's decision not to impeach [Shelby] was not one of strategy, but rather of failing to lay the proper foundations." The motion court further concluded that the

trial court would have permitted Miller's impeachment testimony if the proper foundation had been laid.

The record does not support the motion court's findings and conclusions. At trial, the State objected to defense counsel's attempt to cross-examine Shelby on her threats to make complaints about Miller to DFS. The trial court ruled that any specific questions about Shelby's threatened DFS complaints against Miller were irrelevant to the complaints and pending charges against Borst. In light of the court's exclusion of this evidence on relevancy grounds, it is clear that the trial court would not have permitted Miller to testify about Shelby's threats to make false complaints to DFS.

Trial counsel exercised the skill and diligence of reasonably competent attorneys in seeking to introduce evidence of Shelby's threatened complaints against Miller. Counsel explained to the trial court that it was necessary for the defense to cross-examine Shelby on this subject for impeachment purposes. The trial court excluded the questioning despite the best efforts of counsel to demonstrate its relevancy. Based on this record, the motion court clearly erred in concluding that counsel's performance was deficient.

The motion court also clearly erred in determining that Borst was prejudiced by the lack of any further impeachment evidence against Shelby. As discussed previously, Shelby was one of several witnesses who testified about K.B.'s descriptions of sexual abuse by Borst. K.B. testified in person, and her testimony was consistent with statements she previously made to Jill Hazel, Julie Donelon, and Melinda Houdyshell about specific acts Borst committed. The State's case was bolstered by Borst's admissions to DFS officials that K.B.'s allegations were true and his acknowledgement to a police detective that he was seeking treatment as a sexual offender. At the post-conviction hearing, trial counsel Keller recognized that these concessions were extremely damaging and took this case out of the "he said, she said" category. We find it probable that the jury would have convicted Borst on the strength of this evidence, regardless of any further efforts to impeach Shelby.

Borst failed to prove both the performance and prejudice elements of his claim that trial counsel unreasonably failed to cross-examine Shelby on her threats to complain to DFS about abuse by Miller. Accordingly, he was not entitled to post-conviction relief on this claim. Point II is granted.

## CONCLUSION

We reverse the motion court's judgment setting aside Borst's sentences and convictions on Counts II, IV, VI, and VIII of the indictment. The motion for post-conviction relief is denied, and the sentences and convictions on the referenced Counts are hereby reinstated.

ALL CONCUR.